UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

CAUSE NO. 3:24cr45 DRL

ORLANDO RODRIGUEZ-ROMAN,

Defendant.

MEMORANDUM AND OPINION

In June 2024, a United States Postal Inspector intercepted a suspicious package from Puerto Rico containing cocaine and replaced it with a sham substance. After delivery, Orlando Rodriguez-Roman left his house with cocaine, methamphetamine, and portions of the package in trash bags that he promptly threw out of his car when law enforcement pursued him.

A jury convicted him on three counts of a superseding indictment—attempted possession with the intent to distribute 500 grams or more of a mixture and substance containing cocaine (count 1), *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, possession with the intent to distribute 500 grams or more of a mixture and substance containing cocaine (count 2), *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and unlawful possession of ammunition as a felon (count 3), *see* 18 U.S.C. § 922(g)(1).

The court must calculate the guideline range correctly, then decide what sentence is right and reasonable for this defendant. *Dean v. United States*, 581 U.S. 62, 67 (2017); *United States v. Swank*, 37 F.4th 1331, 1334 (7th Cir. 2022). The 2024 guidelines apply. Given the number of objections to the revised presentence report and the anticipated evidence, the court bifurcated sentencing to decide the objections first and next to conduct sentencing, with the guideline range

then available to the parties. This opinion memorializes rulings from the evidentiary hearing and decides the last objection that was taken under advisement.[1]

    A.  *Government's Objection to a Missing Drug Premises Enhancement (Paragraph 42 and 45).*

The government argues for a two-level enhancement for maintaining a drug premises. This enhancement "applies to a defendant who knowingly maintains a premises . . . for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 app. n.17. The government must prove this by a preponderance of the evidence. *United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023). The law cautions against stretching borderline cases and "applying the enhancement beyond its intended application." *United States v. Montgomery*, 114 F.4th 847, 849 (7th Cir. 2024) (*per curiam*); *see also United States v. Ford*, 22 F.4th 687, 695 (7th Cir. 2022).

A defendant "'maintains' a drug house if he owns or rents premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." *United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008). This record offers no evidence that Mr. Rodriguez-Roman manufactured or sold drugs at the River home, no evidence he directed buyers there or received payments there, and no evidence he stored drugs there for any real sustained period of time. *See United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2021) ("focus on both the frequency and significance of the illicit activities," including "quantities dealt, customer interactions, . . . and accepting payment").

---

[1] For sound reasons, the government withdrew its objection to the unpointed convictions for possessing with the intent to distribute a controlled substance (¶ 48, 74-75, 117) and to an absent career offender classification (¶ 42, 45, 74-75, 117). As a corollary to this, the defendant withdrew his objection to the presentence report's classification of his armed robbery and kidnapping convictions as crimes of violence (¶ 30, 61). *See, e.g., United States v. Torres-Rosa*, 209 F.3d 4, 8 (1st Cir. 2000); *United States v. Morales-Diaz*, 925 F.2d 535, 540 (1st Cir. 1991); *see also* U.S.S.G. § 4A1.1 background.

There is evidence of his domain and control. He lived at the residence for two years. His passport and pills in his name were recovered from a bedroom, and he and his housemate (who leased the home) split rent. *See United States v. Thomas*, 845 F.3d 824, 832 (7th Cir. 2017).

The government advances the theory that Mr. Rodriguez-Roman stored drugs at the home for the purpose of distribution. He left the home with enough cocaine to conclude that he at least stored it at the home on the day of his arrest for the purpose of distributing it, and reasonably some time beforehand given its weight. How long one cannot be sure. The methamphetamine he had wasn't much (less than 23 grams), and it wasn't prepackaged for distribution as the 793 grams of cocaine was.[2]

The cocaine came to the house from somewhere. Perhaps, and likely at most, one might reasonably conclude that the cocaine recovered on June 13, 2024 came from a prior package from Puerto Rico in May 2024 [*see* Ev. Ex. 1]. Both packages arrived at the house next door; both shared addresses and return information; both had been dispatched using similar means and payment. Mr. Rodriguez-Roman had photographs of certain packages on his cellphone, including the one from June and another from May (though perhaps not the same May package referenced in the USPS report) [Tr. Exs. 20a, 24a]. The prior May delivery would easily cover what he had on him when he left the home the day of his arrest.[3] Even if the court reached this conclusion, a mere three or four weeks of drug storage for intended distribution in the course of two years living there would not qualify on this record as a sustained period of time to justify the enhancement. *See, e.g., United States v. Zamudio*, 18 F.4th 557, 563 (7th Cir. 2021) (enhancement

---

[2] The court credits Task Force Officer Thomas Quinn's trial testimony concerning typical distribution amounts.

[3] Subtracting the weight from the largest typical USPS package and netting out other possible materials, the May 2024 delivery could have had more than 1600 grams of cocaine in it given its 68-ounce total weight.

applied when defendant stored drugs in garage for 2-3 months); *Ford*, 22 F.4th at 695 (defendant's usage of rear bedroom for four months "closer to the outer limits of the enhancement's reach").

That he must have stored cocaine in the home for a time to distribute it isn't hard to verify. He kept tools of the trade and likely a ledger there. *See Contreras*, 874 F.3d at 284 (considering same); *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013) (same). He had scales, baggies, and a vacuum sealer—no doubt items he used to prepackage the bags of cocaine he took from the home that day. He had some ammunition, though apparently no rifle to fire it. He had two phones. The government says one phone had pictures indicative of drug trafficking, including suspected cocaine and currency, but never verifies (beyond what the court saw at trial) that the other photographs were taken in the home or when they might have been taken to demonstrate that trafficking (or storage in aid of it) occurred over a sustained period. He had but modest cash, less on hand than a typical longstanding trafficker and, even then, only in his SUV, not in the house. He worked full-time, so it proves difficult to say his dealing was significant enough to call any storage essential to his livelihood. He had a drug ledger, but the government has not provided it to the court to surmise the duration or extent of his storage or dealing.

The government points to other suspicious packages to extend the time Mr. Rodriguez-Roman must have used the home for distribution—three other packages to be precise, one each month from August to October 2023. Putting aside any discovery concerns for the moment (as they soon become moot), these packages raise eyebrows, given their origin and similar method of shipping, but still don't meet the government's burden. No one knows whether these packages even had drugs in them. They weren't inspected. There wasn't a canine alert. Mr. Rodriguez-Roman took only one into the home. They were of variable rather than similar weights. And they arrived at the home where Mr. Rodriguez-Roman lived rather than next door, where one package

of drugs went and where another likely drug package went. Query reasonably whether these earlier packages could just as easily have been test packages to his own home before ramping up real deliveries to the home next door. They are suspicious, but not so suspicious that law enforcement intervened or acted; and if they're not suspicious enough to trigger action by officers, the court cannot say they are probative enough to rely on today to impose this enhancement.

Using the home regularly as a delivery point could be important, even if the drugs remained there momentarily. But if these packages contained drugs at all—and there's something of a guess in that—at most one could say the house was used for a time to receive drugs, but not to store drugs for distribution. There's no evidence that any such weights from August to October 2023 were kept there. *Cf. Zamudio*, 18 F.4th at 563 (defendant hid bundles of drugs throughout garage for 2-3 months and kept drug paraphernalia in his car); *United States v. Sanchez*, 810 F.3d 494, 495, 497 (7th Cir 2016) (affirming enhancement when defendant received large drug deliveries every few weeks, was paid a large sum for storage, and controlled access to drugs); *United States v Sullivan*, 2025 U.S. App. LEXIS 12141, 7-8 (7th Cir. May 20, 2025) (affirming enhancement when officer testified at sentencing he saw suitcases filled with drugs delivered to defendant's residence on weekly basis, sometimes on back-to-back days).

However close this case might come, the record falls short of showing that Mr. Rodriguez-Roman, for a sustained period of time, maintained a stash house or stored drugs for distribution at the home to call it a primary purpose of the home rather than an incidental one—at least as the guidelines would have it. *See Contreras*, 874 F.3d at 283 (reciting standard). The court overrules the government's objection accordingly.

B. *Defendant's Objection to the Weapon Enhancement (Paragraphs 26, 29, 38, 42, 45, 117).*

The enhancement for possessing a dangerous weapon "reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1 app. n.11(A); *see* U.S.S.G. § 2D1.1(b)(1). The government must first establish by a preponderance of the evidence that the defendant possessed the weapon. *Ford*, 22 F.4th at 692. If proven, the burden shifts to the defendant to show it was clearly improbable that he possessed the weapon in connection with the drug offense. *Id.*; *see also* U.S.S.G. § 1B1.1 app. n.1(I).

Mr. Rodriguez-Roman denies he possessed a firearm. He had none on him. A ghost gun was found in the living room couch [Tr. Ex. 64]. The government must show he possessed a firearm, actually or constructively. *See United States v. Cooper*, 767 F.3d 721, 732 (7th Cir. 2014). The government has no evidence that he ever physically possessed the handgun. Indeed, the government never charged him with unlawful possession of the handgun, just ammunition. The government offers no fingerprint or DNA analysis, though their absence isn't altogether uncommon. *See, e.g., United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005). The government proceeds on a constructive possession theory.

"Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). It can be established when the defendant "knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *Id.* (citation omitted). This nexus differentiates "true possessors from mere bystanders." *Id.*

Constructive possession can be established by a defendant's exclusive control over a home or a "substantial connection" to the place where contraband is found. *Id.* at 695-97. Mere

6

proximity isn't enough. *Id.* at 696. Rather, "proximity coupled with evidence of some other factor—including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise is enough[.]" *Id.* (quotation omitted). For instance, constructive possession exists when a firearm is found in a defendant's bedroom next to his envelopes and prescription medications; or when firearms are found in a bedroom with a gold bracelet with his nickname, bills in his name, and men's clothing. *See id.* at 697 (discussing cases).

Mr. Rodriguez-Roman lived in the home with a housemate. He lacked exclusive control over the home. The ghost gun was found behind a cushion in the living room, where both men could access it. *See id.* at 698 (defendant's ability to access a firearm, without evidence of control or ownership, is insufficient to show constructive possession).

The court nonetheless finds that the government has proven possession by a preponderance of the evidence by virtue of his substantial connection to the ghost gun in the couch beyond just its presence in his vicinity. First, the gun was found in close proximity to his USPS package—indeed, in the same living room and beside where Mr. Rodriguez-Roman opened it—and not far in the home from drug paraphernalia. Second, he had every motive to have a loaded and untraceable handgun in the house where he likely opened and kept cocaine and drug paraphernalia for a time. Third, his cellphone had a picture of the same gun [Tr. Ex. 23a]. Fourth, the only other person in the house (his housemate) credibly testified at trial that the gun wasn't his. These features suffice to support the enhancement today.

Any one of these things might be explained away in a vacuum, and thereby foreclose this conclusion in another case. For instance, one might say the handgun wasn't found in close proximity to actual contraband, but Mr. Rodriguez-Roman believed the package contained

cocaine. He doesn't get a pass merely because his belief turned out to be wrong. In addition, a gun "found in close proximity to drug activity [is] presumptively connected to that activity . . . includ[ing] proximity to drug paraphernalia, such as a scale." *United States v. Thurman*, 889 F.3d 356, 372 (7th Cir. 2018) (quotations omitted); *see also United States v. Rea*, 621 F.3d 595, 606-07 (7th Cir. 2010) (enhancement applied when three firearms were recovered from closet and bedrooms, $1,768 cash from living room, and scale from bathroom, but no drugs).

One might have drugs without ever possessing a firearm, but having drugs provides a motive for having a firearm; and the two in proximity (or believed in proximity), with other notable features, permits the court to say reliably that the firearm protected his stash or emboldened his trade. *See United States v. Coley*, 137 F.4th 874, 883-84 (7th Cir. 2025); *Griffin*, 684 F.3d at 696. Mr. Rodriguez-Roman seemingly kept many things that mattered to him, or that served his illegal activity, in his bedroom, and he fled without ever taking the handgun with him. His flight alone might cut crosswise, *see United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009) (discussing cases), but he also left behind other items that implicated him in crime, including ammunition and drug paraphernalia, so he wasn't so careful that he cleaned out everything from the home in a hurry after seeing the sensor and GPS tracking device.

A single photograph of the ghost gun, without more about who took the photograph, or when, or whose hand it might show, may not suffice alone as something more, for someone might have just sent it to him (being, as it was, extracted from WhatsApp). But, with all the other evidence, the photograph on his cellphone tends to show both his knowledge of the firearm and his likely connection to it. The court gets it: just because one person in a dual-resident home says the gun isn't his doesn't alone mean the gun belongs to the other; but when the one testifies credibly to that under oath, subject to cross-examination, and no other reasonable explanation

appears on the record (such as traffic by visitors, drug buyers, or the like), it tends to make the only other person's connection to the gun more substantial, particularly when weighed with all the other evidence noted here.

In sum, Mr. Rodriguez-Roman had a "substantial connection" to the place where contraband was found. In the home where he lived, there was not just close proximity between the ghost gun and his believed-to-be contraband, actual paraphernalia, and the cocaine he fled with, but other "plus factors" that dual-residency cases consider—a connection with an impermissible item (the photograph), proof of motive (his drugs and paraphernalia), and sworn testimony that reasonably tends to point the finger his way. This evidence shows his constructive possession as well as debunks the argument that the handgun was improbably connected to his drug activity, much less clearly so. The court thus overrules the defendant's objection to this enhancement.

C. *Defendant's Objection to Certain Identifying Data (Page 3).*

Mr. Rodriguez-Roman objects to the inclusion of certain identifying information, specifically the notation of a supposed alias ("Junior Rodriguez") and an Indiana driver's license number when he says he only had a permit and his valid driver's license was from Puerto Rico. These statements will have no bearing on his sentence, so the court overrules the objection as moot. *See* Fed. R. Crim. P. 32(i)(3)(B).

D. *Defendant's Objection to Adult Criminal Convictions and Computation (Paragraphs 48-75, 117).*

Mr. Rodriguez-Roman objects to the restatement of his criminal history from Puerto Rico, disputing that the records reliably show his convictions, sentences, or service time. He says the records utilized to calculate and point his criminal history aren't sufficiently reliable. He says there

9

is no English translation of these records. A little digging by either side might have saved everyone

a great deal of time.

The court may rely on factual information from a presentence report so long as it bears

sufficient indicia of reliability to support its probable accuracy. *United States v. Salinas*, 365 F.3d

582, 587 (7th Cir. 2004). A defendant has a due process right to be sentenced only on the basis

of reliable information. *United States v. Adams*, 879 F.3d 826, 829 (7th Cir. 2018). "When the court

relies on such information in sentencing a defendant, the defendant bears the burden of showing

that the presentence report is inaccurate or unreliable." *Salinas*, 365 F.3d at 587. The defendant

cannot attack the information in the presentence report by merely making a bare denial of its

accuracy. *See United States v. Moore*, 52 F.4th 697, 699 (7th Cir. 2022); *United States v. Sunmola*, 887

F.3d 830, 839 (7th Cir. 2018); *United States v. Heckel*, 570 F.3d 791, 795 (7th Cir. 2009).

Mr. Rodriguez-Roman really offers only a bare denial. When pressed, he cannot articulate

any inaccuracy in the restatement of his criminal history. He suggests unreliability merely because

the underlying documents for his criminal history from Puerto Rico are written in Spanish, but

just because a document has been communicated in another language doesn't mean it is

unreliable. That is no less true when he can read documents in Spanish; and, though he may not

have precise memory of each sentence, date of conviction, or service time, he has enough working

knowledge to read the documents to determine whether they might strike as inaccurate and

thereby assist his counsel to identify such a concern. Without producing "some evidence that

calls the reliability or correctness of the alleged facts into question," *Salinas*, 365 F.3d at 588

(quotation omitted), the court may rely on facts in the presentence report.

The government did itself no favors by merely providing the court a one-page certification in Spanish, without translation or sworn origin.[4] That said, the court reviewed the documents on which the probation office relied to craft this portion of Mr. Rodriguez-Roman's criminal history. There were two types of documents. First, the Chief United States Probation Officer for the District of Puerto Rico provided to the authoring probation officer a report (all in English) of a criminal record check through the Puerto Rico Judicial Online Portal, specific to Mr. Rodriguez-Roman (referencing his birthdate and social security number), that recounts his territorial convictions and other related information one-by-one. Second, the probation department acquired certain official records of these convictions. These records (mostly in Spanish) reflect the same cause numbers of cases as stated in the presentence report (save for the one in ¶ 65, but it is covered by the criminal record check in English), the defendant's name, and often his social security number. They include a series of court documents from Puerto Rico by way of criminal complaints (denuncia or acusación) and judgments (sentencia)—documents signed, at times stamped with a seal, and each document seemingly reviewed and initialed by the compiler of these archived court records. Records need only be reliable, not infallible. Nothing strikes the court as unreliable about either type of these source documents. And there is nothing inherently unreliable with an English-speaking probation officer working with a Spanish-speaking (or bilingual) probation officer to recount an offender's criminal history accurately, all from official sources. The court accordingly overrules this objection.

---

[4] The court isn't aware of any decision from this circuit addressing this precise type of document, but other circuits have deemed summaries of criminal history sufficiently reliable. *See United States v. Ortega-Calderon*, 814 F.3d 757, 762 (5th Cir. 2016); *United States v. Zuniga-Chavez*, 464 F.3d 1199, 1205 (10th Cir. 2006); *see also United States v. Dobbin*, 147 F.4th 333, 342-43 (3d Cir. 2025). Summaries, even without certification, can be reliable. *See Zuniga-Chavez*, 464 F.3d at 1205; *United States v. Stobaugh*, 420 F.3d 796, 803 (8th Cir. 2005); *United States v. Fordham*, 187 F.3d 344, 347 (3d Cir. 1999).

E.  *Guideline Calculation.*

With these rulings, and subject to counsel's review and comment at the upcoming sentencing, the court will adopt as its findings ¶ 1-139 of the revised presentence report.

The guidelines group the three counts, *see* U.S.S.G. §§ 3D1.2(c), (d), with the combined drug weight ultimately driving the base offense level calculation. Mr. Rodriguez-Roman starts at level 28 because his offenses involved between 700 and 1,000 kilograms of converted drug weight (just over 827 kilograms). U.S.S.G. §§ 2D1.1(a)(5), (c)(6). He receives two levels because he possessed a firearm, U.S.S.G. § 2D1.1(b)(1), and two levels more because he recklessly created a substantial risk of death or serious bodily injury while fleeing law enforcement, U.S.S.G. § 3C1.2, thereby concluding at level 32.

The guidelines assess nine criminal history points and place him in criminal history category IV. There the guidelines recommend a sentencing range of 168-210 months, U.S.S.G. chap. 5A, within the statutory range (5-40 years) for counts 1 and 2, 21 U.S.C. § 841(b)(1)(B), though subject to a statutory maximum of 180 months on count 3, 18 U.S.C. § 924(a)(8). Sentencing will proceed as scheduled.

SO ORDERED.

October 20, 2025                                         *s/ Damon R. Leichty*
                                                        Judge, United States District Court


cc: Mr. Orlando Rodriguez-Roman